1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9          EASTERN DISTRICT OF CALIFORNIA

10

11   HILARIO AGUERO,                          No. 1:17-cv-00103-AWI-SKO

12              Petitioner,                   **FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF**

13        v.                                  **HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF**

14   C.E. DUCURAT,                            **APPEALABILITY**

15              Respondent.                   **(Doc. 15)**

16

17

18          Petitioner, Hilario Aguero, is a state prisoner proceeding *pro se* with a petition for a writ of

19   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner alleges four grounds for habeas relief: (1)

20   the trial court erred by failing to *sua sponte* instruct on the "escape rule"; (2) insufficient evidence;[1]

21   (3) jury instruction error; and ineffective assistance of counsel.  The Court referred the matter to

22   the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304.  Having

23   reviewed the record as a whole and applicable law, the undersigned recommends that the Court

24   deny the habeas petition.

25

26

27
     _____
28   [1] Petitioner broke his insufficient evidence claim into four separate claims.  The Court has combined them for clarity, but will address all four claims individually.

                                                  1

## I.     Factual and Procedural Background[2]

Petitioner and three co-defendants, Emmanuel Toscano ("Toscano"), Gabriel Gonzales ("Gonzales"), and Fernando Garcia-Santos ("Garcia-Santos") were charged and tried together before a jury for crimes that were committed over the course of two days, August 28, 2010 and April 30, 2011.[3]

Ramzee Johnson ("Johnson"), an African American man in his mid-thirties, lived with his family in a predominately Hispanic neighborhood in northeast Bakersfield, California.   At approximately 3:00 a.m. on August 28, 2010, Johnson left his apartment to walk to the market.

Shortly after leaving his apartment, Johnson saw Petitioner and Francisco Castro ("Castro") standing about a block and a half away from him.  When Petitioner and Castro started walking towards him, Johnson became nervous and turned around to walk back to his apartment.

Petitioner and Castro caught up to Johnson, stood in front of him, and asked him "gang questions" like "where are you from?" and "where you at?"  Johnson replied that he was "not from anywhere" and stated he lived on the street where they were standing and that they were in front of his residence.

Castro pulled out a .25-caliber, semiautomatic firearm and Johnson heard a clicking sound, indicating the gun had been cocked.  Believing he was about to be killed, Johnson grabbed for the gun.  The gun fired as soon as he grabbed it, but the shot missed him.  Johnson twisted the gun out of Castro's hand and fired back at Castro.  Petitioner and Castro fell to the ground and then quickly got up and ran away.  Johnson fired the gun in their direction several times until he heard a click and the gun appeared to be empty.  Johnson called 911.

---

[2] The factual background, taken from the opinion of the California Court of Appeal, Fifth Appellate District, *People v. Toscano et al.*, (F065808) (Cal. App. Aug. 27, 2015), is presumed to be correct.  28 U.S.C. § 2254(e)(1).
[3] Christian Albarran ("Albarran") was originally named as a defendant.  However, Albarran entered a no contest plea prior to trial and did not otherwise participate directly in trial.

When police officers arrived, individuals in front of a nearby residence yelled at the officers that their friends were inside, shot and bleeding. Officers found Petitioner and Castro inside the residence, both with gunshot wounds.

Petitioner and Castro were transported to the hospital for treatment. When a police officer returned to the hospital two days later to transport Petitioner to jail for booking, the officer discovered that nursing staff had accidentally released him from custody. The police could not locate Petitioner prior to the events of April 30, 2011.

On April 30, 2011, Gerardo V. ("Gerardo") was fatally shot in a church parking lot in west Bakersfield, California. The parking lot was located next to a restaurant where Gerardo and some of his high school friends were attending a quinceañera.

At trial, the prosecutor argued that the shooting was an act of gang-related retaliation for a shooting that occurred six days earlier on April 24, 2011. On that day, the perpetrators shouted either "Westside" or "Southside" and shot at one of Petitioner's co-defendants, Toscano, and his brother, Jacob Toscano ("Jacob"). Jacob was injured.

Toscano told a deputy responding to the scene that he and his brother were walking home from a 7-Eleven when a car pulled up next to them. Several African American males exited the car and shot at Toscano and his brother. When the assailants shouted "Southside," Toscano responded by "gangbanging back at them" and yelling "Hillside."[4]

In the days after the April 24, 2011 shooting, Melina M. ("Melina"), a 16-year-old who knew Toscano overheard Toscano talking about Jacob being shot. Toscano appeared very angry and she heard him say "something about the Westside."

On the afternoon of April 30, 2011, Melina saw Toscano and invited him to attend her friend's quinceañera. Petitioner was standing with Toscano when Melina invited Toscano.

---

[4] "Hillside" refers to a sect of the Loma Bakers gang in the Hillside area of Bakersfield.

Toscano, Petitioner, and the other co-defendants showed up at the restaurant where the quinceañera was being held, and Melina went out to meet the men.

Melina became upset with Toscano when he started leading the others in his group in "pretending" to be members of the Westside Bakers gang. Melina knew Toscano was actually an "Eastsider" and member of the rival Loma Bakers gang. Toscano and his friends were shouting "Westside" and directing Westside hand signals towards other men at the quinceañera, who were socializing around the restaurant and in an adjacent minimarket. Toscano warned Melina in front of the others not to tell anyone that his group was from "the East." He also showed her that he was armed by lifting his shirt and exposing the handle of a firearm tucked inside his waistband.

Melina asked Toscano to leave and went back inside the restaurant. From inside the restaurant, she saw Petitioner and his three co-defendants leave. The men crossed in front of the restaurant and then headed towards the church parking lot. The murder victim, Gerardo, and three of his friends were in the church parking lot waiting to get into a car. Petitioner and his co-defendants surrounded Gerardo and his friends.

Led by Toscano, the group asked Gerardo and his friends where they were from. Gerardo's friends responded that "we don't bang." Maintaining the pretense that they were West Side Bakers, Toscano and his group started making derogatory comments about Eastsiders and asked Gerardo's group where they could find some Eastsiders.

Eventually, both groups shook hands and Petitioner's group appeared to be preparing to leave. Gerardo and his friends got into their car, with Gerardo in the front passenger's seat. The front passenger-side door was still open, when Toscano said "Keep it Westside," to which Gerardo replied, "I'm Westside, too."

When Gerardo stated he was Westside, Gonzales went up to the car and asked Gerardo what he had said. Gerardo repeated that he was from the Westside too, Petitioner replied, "You're not

from my hood," and challenged Gerardo to get out of the car and fight him.

Petitioner and his co-defendants were saying things to "pump up" Gonzales, including: "Just fight him. Just fight him." Gerardo's friends told him to just be quiet and started the car up to leave; however, they could not drive away without hitting someone in Petitioner's group, who had all surrounded the car.

While recollections differed as to the details of events, Gerardo's group all remembered seeing Gonzales reach into the car and grab Gerardo's cell phone from his hands or from his lap. As Gonzales grabbed the cell phone, someone heard him call Gerardo a "bitch" and say, "give me your fucking phone."

Gerardo begged Gonzales to return his phone. Gonzales responded by saying something to the effect that he would return Gerardo's phone, but first Gerardo would have to get out of the car and fight him. Petitioner's group continued to challenge Gerardo to get out of the car and fight with Gonzales.

Remaining inside the car, Gerardo continued imploring Gonzales to return his cell phone and repeating that he did not want to fight Gonzales. Gerardo also expressed some confusion, asking Gonzales why they were supposed to be fighting when they were from the "same hood."

Gonzales reached into the car again and grabbed Gerardo's hat from his head. Gerardo told Gonzales to keep the hat, but give him back his phone. Gerardo finally closed his door and said, "I'm going to call the big [homeys]."

Toscano walked back up to the car and opened Gerardo's door. Toscano then pulled out the gun and shot Gerardo. Petitioner and his group then ran away together towards a nearby alley, shouting something as they ran. Meanwhile, Gerardo got out of the car and started running towards the restaurant. Gerardo collapsed outside the restaurant and died shortly thereafter from the gunshot wound to his left shoulder.

The pathologist who performed the autopsy explained that Gerardo suffered extensive blood loss due to the laceration of vital organs, including a major vein in his heart and the upper lobes of both his lungs.

At trial, Kern County Sheriff's Deputy Richard Hudson ("Hudson") testified as a gang expert for the prosecution. Hudson opined that, at the time of their offenses, Petitioner and his co-defendants were all members of, and active participants in, the Loma Bakers criminal street gang.

Presented with hypotheticals based on the August 2010 and April 2011 incidents underlying the charged offenses, Hudson opined the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang. With respect to the gang-benefit of the April 2011 offenses, Hudson opined that the scenario presented was an act of retaliation and explained:

> When an individual is put in a situation where a gang is going to require retaliation, when they conduct that retaliation they're going to create status, fear within the neighborhood, because this incident will be talked about. It will be discussed. People will hear about it in schools. They'll hear about it in the neighborhood. It will get around.
>
> So the information will get out to other gangs, as well as the neighborhood, that these individuals, when disrespected, will, in this case, kill you, and by doing that they're going to limit the amount that people will be willing testify; that other gang members will be willing to come to their neighborhood and disrespect them.

Regarding his opinion that the offenses were committed in association with a criminal street gang, Hudson specifically testified:

> Based on the hypothetical, all the members acted together to accomplish a goal. They traveled together to rival territory. They all pretended to be Westside together. They all took part in that. They attempted to identify – through the hypothetical attempted to identify rivals. Once they did they all acted together by moving as a group from one point to another to confront those individuals that they perceived to be rivals. They also confronted them by both words, surrounding, and then this violence escalated tougher as they continued to support each other. And then when the cell phone and hat was taken, while the others were present, they continued to be verbally and physically supportive and backing that individual, continuing to say different statements. And then the mere numbers of surrounding is an intimidation. And then during the shooting all the other individuals were still present by the shooter and they all fled together.

Harlan Hunter ("Hunter"), a private investigator, testified as a gang expert on behalf of co-defendant Gonzales. Assuming the same hypothetical facts based on the April 2011 incident, as those addressed by the prosecution's gang expert, Hunter opined that the shooting was a "personal incident" and was

> not done for the benefit of a gang, but . . . was actually done for the benefit of the shooter, who basically had come there already upset about a previous shooting of his brother, and at that particular time decided that he was going to shoot the victim.

Harlan further opined:

> [T]here's nothing in that hypothetical that supports any notion, idea, [or] knowledge that the other parties who were with the shooter had knowledge that the shooter was going to shoot the victim. . . .

> And so again, it's my opinion on that particular day that this was not done for the benefit and in association with these other individuals, but done by an individual who basically was angered by this threat of don't make me get my big homeys, which is akin to don't make me go get my friends and come back and deal with you, became upset and shot the victim.

At trial, the court gave a jury instruction about aiding and abetting relevant to the case at bar. As read to the jury, CALCRIM No. 400 stated:

> A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.

On August 8, 2012, Petitioner was convicted of first degree premeditated murder, with robbery and gang special circumstance findings (Cal. Penal Code §§ 187, 189, 190.2(a)(17), (22)); second degree robbery (Cal. Penal Code § 211); shooting at an occupied motor vehicle (Cal. Penal Code § 246); active participation in a criminal street gang (Cal. Penal Code § 186.22(a)); and assault with a firearm (former Cal. Penal Code § 245(b)). With regard to the murder, robbery, and shooting into an occupied vehicle counts, the jury found true the allegations that a principal discharged a firearm during the crime causing death. (Cal. Penal Code §§ 12022.53(d), (e)(1)).

Petitioner was sentenced to life without the possibility of parole, plus twenty-five years to life, plus eleven years.

On August 27, 2015, the Court of Appeal for the Fifth Appellate District ("Court of Appeal") affirmed Petitioner's conviction.[5] On November 24, 2015, the California Supreme Court denied review.

On January 23, 2017, Petitioner filed his petition for writ of habeas corpus before this Court. Respondent filed a response on May 23, 2017.

## II.    Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). Under the statutory terms, the petition in this case is governed by AEDPA's provisions because it was filed April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[5] On September 15, 2015, the Court of Appeal filed a modified opinion to correct an error in the original opinion, but did not change the judgment.

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71.  In doing so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision.  *Id.*  The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72.  The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002).  The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, the AEDPA standard is difficult to

satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

## III.  Jury Instruction Errors Do Not Present Cognizable Federal Claims

In his first ground for habeas relief, Petitioner contends the trial court erred by failing to *sua sponte* instruct the jury with CALCRIM No. 3261, the "escape rule." [6]   (Doc. 1 at 5.) Respondent counters the state court reasonably determined that there "was no substantial evidence that Petitioner and his codefendants had 'successfully escaped from the scene' of the robbery before Toscano killed Gerardo [ ][;]" therefore, the instruction was not applicable in this case.  (Doc. 15 at 24.)

### A.  Federal Habeas Review of Jury Instruction Errors

Generally, claims of instructional error are questions of state law and are not cognizable on federal habeas review.   "It is not the province of a federal court to reexamine state court determinations of state law questions."  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  "The fact that a jury instruction violates state law is not, by itself, a basis for federal habeas corpus relief." *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006).  "[A] petitioner may not "transform a state-law

---

[6] The pattern jury instruction for CALCRIM No. 3261 states:

> The People must prove that < *insert allegation, e.g., the defendant personally used a firearm* > while committing [or attempting to commit] < *insert felony or felonies* >.

> . . .

> < *Robbery*>

> [The crime of robbery [or attempted robbery] continues until the perpetrator[s] (has/have) actually reached a place of temporary safety.

> The perpetrator[s] (has/have) reached a place of temporary safety if:

> - (He/She/They) (has/have) successfully escaped from the scene; [and]
> - (He/She/They) (is/are) not or (is/are) no longer being chased(; [and]/.)
> - [(He/She/They) (has/have) unchallenged possession of the
> - [(He/She/They) (is/are) no longer in continuous physical control of the person who is the target of the robbery.]]

issue into a federal one merely by asserting a violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997).

A trial court's refusal to give an instruction does not, by itself, raise a cognizable claim under federal habeas review. *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). To prevail in a collateral attack on state court jury instructions, a petitioner must do more than prove that the instruction was erroneous. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Instead, the petitioner must prove that the error "by itself so infected the entire trial that the resulting conviction violated due process." *Estelle*, 502 U.S. at 72. Even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Due process requires "criminal defendants be afforded a meaningful opportunity to present a complete defense." *Clark*, 450 F.3d at 904 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)) (internal quotation marks omitted). Criminal defendants are entitled to adequate instructions on the defense theory of the case; however, Due Process only requires instructions be given when the evidence supports the instruction. *Conde v. Henry*, 198; F.3d 734, 739 (9th Cir. 2000); *Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).

Omitting an instruction is less likely to be prejudicial than misstating the law. *Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson*, 431 U.S. at 155.)

**B. State Court of Appeal Opinion**

The Court of Appeal rejected Petitioner's assertion that the trial court should have *sua sponte* instructed on CALCRIM No. 3261:

> CALCRIM No. 3261 is a pattern instruction designed to assist jurors in determining whether a perpetrator reached a place of temporary safety for purposes of the so-called "escape rule." Under this rule, a killing committed by a felon during his or her flight from the scene of the crime, and before reaching a place of temporary

safety, is within the scope of the felony-murder statute (§ 189). (*People v. Wilkins* (2013) 56 Cal.4th 333, 341 (*Wilkins*).)

The escape rule is closely connected to the continuous transaction doctrine, i.e., the concept that felony-murder liability may be found in the absence of a strict causal or temporal relationship between the underlying felony and the act resulting in death so long as it is proven beyond a reasonable doubt that the crime and the killing were part of one continuous transaction. (*Wilkins*, *supra*, 56 Cal.4th at pp. 340, 342.) Such a transaction may include the defendant's flight after the felony is committed. (*Id.* at p. 340.) "When the killing occurs during flight, . . . the escape rule establishes the 'outer limits of the "continuous-transaction" theory.'" (*Id.* at p. 345, quoting *People v. Portillo* (2003) 107 Cal.App.4th 834, 846.)

None of the appellants asked the trial court to provide the jury with instructions on the escape rule. However, the jury was instructed with former CALCRIM No. 549,[7] which defined "one continuous transaction." Had the jury also received instructions pursuant to CALCRIM No. 3261, which [Petitioner] argues was mandatory under the facts of the case, it would have been told that a perpetrator is considered to have reached a place of safety if he or she (1) has successfully escaped form the scene; (2) is no longer being chased; (3) has unchallenged possession of the stolen property; and (4) is no longer in continuous physical control of the person who is the target of the robbery. (CALCRIM No. 3261 (2006 rev.).)

"Whether or not the trial court should have given a 'particular instruction in any

---

[7] As given to the jury, CALCRIM No. 549 states:

> In order for the People to prove that the defendant is guilty of first degree murder under a theory of felony murder and that the special circumstance of murder committed while engaged in the commission of robbery is true, the People must prove that the robbery and the act causing the death were part of one continuous transaction. The continuous transaction may occur over a period of time and in more than one location.

> In deciding whether the act causing the death and the felony were part of one continuous transaction, you may consider the following factors:

> 1. Whether the felony and the factual act occurred at the same place;
> 2. The time period, if any, between the felony and the fatal act;
> 3. Whether the fatal act was committed for the purpose of aiding the commission of the felony or escape after the felony;
> 4. Whether the fatal act occurred after the felony but while one or more of the perpetrators continued to exercise control over the person who was the target of the felony;
> 5. Whether the fatal act occurred while the perpetrators were fleeing form the scene of the felony or otherwise trying to prevent the discovery or reporting of the crime;
> 6. Whether the felony was the direct cause of the death; AND
> 7. Whether the death was a natural and probable consequence of the felony.

> It is not required that the People prove any one of these factors or any particular combination of these factors. The factors are given to assist you in deciding whether the fatal act and the felony were part of one continuous transaction.

(Clerk's Transcript 8 at 2355-56.)

particular case entails the resolution of a mixed question of law and fact.' Which is 'predominately legal.'" (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568, quoting *People v. Waidla* (2000) 22 Cal.4th 690, 733.) [Petitioner's] claim is therefore subject to de novo review. (*People v. Hernandez*, *supra*, at p. 568.) For the reason hereafter stated, we reject his assertions of error and conclude that there is no basis for reversal due to the absence of an instruction on the escape rule.

[Petitioner's] position on appeal is based on *Wilkins*, *supra*, 56 Cal.4th 333, where the California Supreme Court found reversible error in a trial court's refusal to grant a defendant's request to have jurors instructed on the escape rule. The trial court had utilized CALCRIM No. 549 to instruct on the continuous transaction doctrine, but ruled that an additional instruction under CALCRIM No. 3261 was not appropriate.

The factual circumstances were markedly different from those in this case. The *Wilkins* defendant was prosecuted for felony murder after a stove fell off the back of his pickup truck while he was driving on a four-lane highway, causing a fatal traffic accident. (*Wilkins*, *supra*, 56 Cal.4th at pp. 338-339.) He had stolen the appliance while burglarizing a partially constructed home, and the evidence presented an issue regarding whether or not he had reached a place of temporary safety when the killing occurred. "Even under the prosecution's theory of events, defendant was 62 miles away from the scene of the burglary when the stove fell off his truck and he had been driving on the freeway at normal speeds for about an hour. There was no evidence that anyone was following him or that anyone was even aware of the burglary." (*Id*. at pp. 347-348.)

Here, the trial court was not obligated to instruct on the escape rule because there was no substantial evidence that appellants had "successfully escaped from the scene" (CALCRIM No. 3261) of the robbery before Toscano shot and fatally wounded Gerardo. Even assuming the evidence showed that appellants' and Gerardo's groups were preparing or beginning to go their separate ways shortly before the shooting and, consequently, appellants were not being chased and had unchallenged possession of Gerardo's property, the escape rule still did not apply because it is undisputed that appellants remained in close proximity to the scene of the robbery (i.e., next to the car into which Gonzales reached and grabbed Gerardo's property) until after Toscano shot Gerardo, at which point they began running from the scene of both the robbery and shooting. [Petitioner's] unique theory that the area around a crime scene might nonetheless qualify as a place of temporary safety for purposes of the escape rule, so long as the other elements of the rule have been met, is unpersuasive and unsupported by authority.

(Lodged Doc. 13 at 33-35.)

## C. <u>The Trial Court Did Not Err by Not Instructing on the "Escape Rule"</u>

Petitioner maintains the trial court should have instructed on the "escape rule," because the "jury could have harbored a reasonable doubt whether my companions and I had already reached a

place of temporary safety when the murder occurred."  (Doc. 1 at 5.)

The state court determined this instruction was not warranted under California law.  This Court is bound by the state court's ruling on a question of state law.  *Estelle*, 502 U.S. at 71-72.  To obtain relief, Petitioner must show the alleged instructional error "had a substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  "A 'substantial and injurious effect' means a 'reasonable probability' that the jury would have arrived at a different verdict had the instruction been given."  *Byrd v. Lewis*, 566 F.3d 855, 860 (9th Cir. 2009) (quoting *Clark*, 450 F.3d at 916).  To determine if Petitioner was prejudiced, the Court will consider: "(1) the weight of evidence that contradicts the defense; and (2) whether the defense could have completely absolved the defendant of the charge."  *Id*. (citing *Beardslee v. Woodford*, 358 F.3d 560, 578 (9th Cir. 2004).  The burden on Petitioner "is especially heavy where . . . the alleged error involves the failure to give an instruction."  *Id*. (quoting *Clark*, 450 F.3d at 904) (internal citations omitted).

Here, Petitioner and his co-defendants were within feet of Gerardo's car when co-defendant Toscano shot Gerardo.  Therefore, the evidence establishes that the co-defendants were still at the scene of the robbery at the time of the murder.

Under the felony murder rule, "'[a] robbery is not complete until the perpetrator reaches a place of temporary safety,' which is not the scene of the robbery."  *People v. Wilson*, 43 Cal. 4th 1, 17 (2008) (quoting *People v. Young*, 34 Cal. 4th 1149, 1177 (2005)).  A "robbery remains in progrees until the perpetrator has reached a place of temporary safety.  The scene of the crime is not such a location, at least as long as the victim remains at hand."  *People v. Flynn*, 77 Cal. App. 4th 766, 772 (2000) (internal citations omitted).

It was reasonable for the Court of Appeal to conclude that because Petitioner and his co-defendants were at the scene of the robbery when co-defendant Toscano shot and killed Gerardo,

they had not reached a place of temporary safety.  Thus, there was no evidence adduced at trial to support the giving of the "escape rule" instruction, CALCRIM No. 3261.

Further, even assuming the trial court should have given the instruction, the error was harmless.  If the jury had been given the "escape rule" instruction, no reasonable juror could have concluded that Petitioner and his co-defendants had reached a place of safety given they were still at the place where the robbery took place when Gerardo was killed.  Because Petitioner cannot show "a substantial and injurious effect," it was not unreasonable for the Court of Appeal's to reject Petitioner's claim.  For these reasons, the Court recommends rejecting Petitioner's claim.

## IV.     The State Court Did Not Err in Denying Petitioner's Insufficient Evidence Claims

In his second ground for habeas relief, Petitioner alleges there was insufficient evidence to convict him of second degree robbery and first degree murder.  Specifically, Petitioner contends there was insufficient evidence to support: (1) the force and fear element of the robbery conviction and robbery-murder special circumstance finding; (2) that Petitioner had an independent felonious purpose; (3) the jury's finding of guilt on the substantive gang crimes and true finding on the gang special circumstance and gang enhancement; and (4) the first degree murder conviction.  (Doc. 1 at 5-6, 8.)  Respondent counters that the Court of Appeal's rejection of Petitioner's claims was reasonable because there was substantial evidence to support the jury's findings.

### A.     Standard of Review for Insufficient Evidence Claims

To determine whether the evidence supporting a conviction is so insufficient that it violates the constitutional guarantee of due process of law, a court evaluating a habeas petition must carefully review the record to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319; *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998).  It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved

conflicting evidence, and drew reasonable inferences from the facts in the manner that most supports the verdict. *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).

After AEDPA, a federal habeas court must apply the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). The United States Supreme Court has explained the highly deferential standard of review in habeas proceedings, noting that *Jackson*

> makes clear that it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

*Cavazos v. Smith*, 565 U.S. 1, 3-4 (2011).

**B. Force or Fear Element of Robbery Conviction and Robbery -Murder Special Circumstance Finding**

In Petitioner's first insufficient evidence claim, he contends there was insufficient evidence to convict him of second degree robbery and the robbery-murder special circumstance. (Lodged Doc. 1 at 5.) Specifically, he alleges there was insufficient evidence that Gerardo's hat and phone were taken by force or fear or that it was done with the intent to permanently deprive Gerardo of his property. *Id.*

**1. State Court of Appeal Opinion**

The Court of Appeal rejected Petitioner's claim:

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by

16

means of force or fear." (§ 211.) Thus, the elements of robbery are: (1) the taking of personal property (2) from a person or the person's immediate presence (3) by means of force of fear, (4) with the intent to permanently deprive the person of the property. (*Ibid*.; *People v. Marshall* (1997) 15 Cal.4th 1, 34.) Appellants contend the evidence was insufficient to establish the third or fourth elements of robbery.

With respect to the third element appellants assert that Gonzales's simple act of reaching inside the car and grabbing or snatching Gerardo's cell phone and hat was insufficient to prove Gonzales accomplished the taking of Gerardo's property by means of force or fear. However, "the requisite force or fear need not occur at the time of the initial taking. The use of force or fear to escape or *otherwise retain even temporary possession of property* constitutes robbery." (*People v. Flynn* (2000) 77 Cal.App.4th 766, 771-772, italics added.)

Even assuming the requisite force or fear did not occur at the time of the initial taking, the record discloses substantial evidence that Gonzales used force or fear to *retain* possession of Gerardo's property and therefore the evidence was sufficient to satisfy the third element of robbery. It is evident from the record that Gerardo dearly wished to recover possession of his cell phone and the jury here could have wished to recover possession of his cell phone and the jury here could have reasonably inferred from all the circumstances that he would have attempted to reclaim his phone but fear prevented him from doing so. Gerardo's fear was evident his obvious reluctance to leave the shelter of Francis's car to try to reclaim his phone, and the evidence supports a reasonable inference that Gonzales and the other appellants intentionally engaged in intimidating behavior to instill fear in Gerardo to help Gonzales retain possession of, and eventually carry away after the shooting, the items he initially snatched away from Gerardo. Such behavior included standing together in close proximity to the car and encouraging and participating in Gonzales's continuing challenges to the victim to get out of the car and fight.

We likewise conclude there was sufficient circumstantial evidence from which the jury could reasonably infer that Gonzales intended to permanently deprive Gerardo of his property and thus satisfy the fourth element of robbery. It is well established that the intent with which a person acts is rarely susceptive of direct proof and usually is inferred from the factual circumstances of the offense. (Former § 21, subd. (a), § 29.2; *People v. Massie* (2006) 142 Cal.App.4th 365, 371.) Although out of the car to fight him, the jury was not required to credit, and could have reasonably doubted the sincerity of, Gonzales's statements, especially in light of members of a rival gang) to target the victim, and conclude that Gonzales intended to deprive the victim permanently of his property whether or not he succeeded in luring the victim out of the car.

(Lodged Doc. 13 at 17-18.)

## 2. **Denial of Petitioner's Insufficient Evidence of Robbery Claim Was Not Objectively Unreasonable**

Petitioner is asking this Court to reweigh the evidence in his favor. However, on habeas

17

review, this Court does not reweigh the evidence presented at trial. Instead, the Court must review the record to determine whether a rational trier of fact could have found co-defendant Gonzales took Gerardo's hat and phone with force or fear and that it was done with the intent to permanently deprive him of his property.

The Court of Appeal set forth the statutory definition of robbery and determined that the evidence satisfied each element, principally the third and fourth elements: (3) by means of force of fear, (4) with the intent to permanently deprive the person of the property. (Lodged Doc. 13 at 17.)

The force or fear needed to commit a robbery does not have to occur only at the time of the taking. *People v. McKinnon*, 52 Cal. 4th 610, 686 (2011). The force or fear used to retain the property also qualifies. *People v. Gomez*, 43 Cal.4th 249, 256 (2008). Consequently, a theft becomes a robbery "if [a] perpetrator, having gained possession of the property without use of force or fear, resorts to force or fear while carrying away the loot." *Id*. at 257.

The "force" required "is such force as is actually sufficient to overcome the victim's resistance. . . ." *People v. Anderson*, 51 Cal. 4th 989, 995 (2009). However, it must be more than the force that is "necessary to accomplish the mere seizing of the property." *Id*. For "fear," an express threat is not required; instead, mere intimidation is sufficient. *People v. Morehead*, 191 Cal. App. 4th 765, 775 (2011). "So long as the perpetrator uses the victim's fear to accomplish the retention of the property, it makes no difference whether the fear is generated by the perpetrator's specific words or actions designed to frighten, or by circumstances surrounding the taking itself." *Flynn*, 77 Cal. App. 4th at 772.

Here, Petitioner and his co-defendants shouted gang slogans and made gang hand signals at Gerardo and his friends. Petitioner's group harassed and intimidated Gerardo and his three friends, who were younger and smaller, throughout the night. When Gerardo's group tried to leave the parking lot in their car, Petitioner's group, composed of six men, surrounded the car and continued

to harass and intimidate Gerardo's group.

Co-defendant Toscano challenged Gerardo to fight, but Gerardo refused. Toscano continued to pressure Gerardo to fight, and Petitioner and his co-defendants encouraged the behavior. When the driver of the car attempted to back his car up, Petitioner's group blocked his path.

After harassing Gerardo's group and pressuring Gerardo to fight, co-defendant Gonzales called Gerardo "a bitch," and grabbed Gerardo's phone from his lap. Gerardo begged for Gonzales to give his phone back, but Toscano stated he would only get it back if Gerardo fought Gonzales. Gonzales then took Gerardo's hat off his head. As Gerardo tried to shut the car door and leave, Toscano shot him.

Considering these facts, force was used to take and retain the property. Gonzales said "[g]ive me your fucking phone," before grabbing Gerardo's phone off his lap. Gonzales also used force to retain both the phone and the hat. Petitioner's group intimidated and harassed Gerardo and ultimately challenged him to a fight if he wanted to get his property back. There is also evidence that Gonzales used fear to take and retain Gerardo's property. The group surrounded the car, and taunted and challenged Gerardo.

The Court of Appeal's decision was not an objectively unreasonable application of clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. For these reasons, the Court recommends denying Petitioner's claim that there was insufficient evidence to support the robbery conviction and robbery special circumstance.

**C.  Independent Felonious Purpose**

In Petitioner's second insufficient evidence claim, he alleges the evidence adduced at trial was insufficient to prove he had an independent felonious purpose to support the robbery special

circumstance finding.  (Doc. 1 at 6.)  Specifically, Petitioner states the "purpose of the [robbery] was to facilitate an assault or murder, not obtain any valuables.  Thus, the robbery was committed to advance the murder, not vice versa."  *Id*.

### 1.  State Court of Appeal Opinion

In his petition before the Court of Appeal, Petitioner challenged the robbery special circumstance findings:

> on the ground the robbery was merely incidental to the murder and there was insufficient evidence of an independent felonious purpose of the crime.

> . . .

> In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Streeter* (2012) 54 Cal.4th 205, 241.)  We accept the logical inferences that the jury might have drawn from the evidence although we would have concluded otherwise.  (*Ibid*.)  Our review is the same in a prosecution primarily resting upon circumstantial evidence.  (*People v. Watkins* (2012) 55 Cal.4th 999, 1020.)  We do not reweigh the evidence or reassess the credibility of witnesses.  (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)  "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*Ibid*.)

> . . .

> [Petitioner] contend[s] the evidence was insufficient to sustain the robbery special circumstance findings because the evidence established the robbery was merely incidental to the murder and there was insufficient evidence the robbery had an independent felonious purpose.

> Under section 190.2, subdivision (a)(17)(A), the robbery special circumstance applies when: "The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies [¶] (A) Robbery in violation of Section 211 or 211.5."

> "For a felony-murder special circumstance to apply, the felony cannot be merely 'incidental or ancillary to the murder'; it must demonstrate 'an independent felonious purpose,' not an intent 'simply to kill.'  [ ] But even if a defendant harbored the intent to kill at the outset, a concurrent intent to commit an eligible

20

felony will support the special circumstance allegation." (*People v. Davis* (2009) 46 Cal.4th 539, 609.)

We agree with the People that there was substantial evidence in this case to support a finding that appellants harbored both an intent to kill and a concurrent intent to rob, which were sufficient to support the robbery special circumstance finding and we reject their argument that the robbery was merely incidental to the murder. As the facts of the murder demonstrate, it was not even necessary for appellants to lure Gerardo outside the car in order to kill him. Moreover, Gerardo's unwillingness to leave the car became apparent early on in his confrontation with appellants' group.

On this record, therefore, it would not have been unreasonable for the jury to conclude that, after the initial taking of Gerardo's possessions by Gonzales but before the fatal shooting by Toscano, appellants likely realized they were not going to be able to use Gerardo's possessions to lure the 16-year-old victim out of his friend's car and so formed an independent intent to deprive him permanently of those possessions while concurrently harboring their original intent to kill. As already discussed, there was sufficient evidence that appellants accomplished this independent intent to rob through the use of fear and intimidation. We therefore reject the argument that the evidence established that appellants' intent during the robbery was simply to kill and that there was no independent felonious purpose for the robbery.

(Lodged Doc. 13 at 16, 20-21.)

## 2. Denial of Petitioner's Independent Felonious Purpose Claim Was Not Objectively Unreasonable

Petitioner challenges the jury's robbery special circumstance finding. The robbery-murder special circumstance applies when a murder is "committed while the defendant was engaged in . . . the commission of, [or] attempted commission of" robbery. (Cal. Penal Code § 1902.2(a)(17(A)). "[T]o prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder." *People v. Lindberg*, 45 Cal. 4th 1, 27 (2008) (internal citations and quotation marks omitted). The prosecutor must show "the defendant intended to commit the [robbery] separately from forming an intent to kill the victim." *People v. Lewis*, 46 Cal. 4th 1255, 1300 (2009) (internal citations and quotation marks omitted). The robbery cannot be "merely an afterthought to the murder, as when for example, the defendant intends to

21

murder the victim and after doing so takes his or her wallet for the purpose of making identification of the body more difficult." *Id.* (internal citations and quotation marks omitted).

Here, the jury was instructed that to find the felony-murder special circumstance true,

the People must prove that the defendant intended to commit Robbery independent of the killing. If you find that the defendant only intended to commit murder and the commission of the Robbery was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved.

(Reporter's Transcript 30 at 5869.)

Petitioner states the purpose of the robbery "was to facilitate an assault or murder"; therefore, Petitioner and his co-defendants did not have the independent felonious intent to rob Gerardo. (Doc. 1 at 6.) The evidence shows that when co-defendant Gonzales approached Gerardo's car, he said "[g]ive me your fucking phone," and grabbed the cell phone off Gerardo's lap. Petitioner's group urged Gerardo to fight Gonzales and when Gerardo refused to get out of the car, Gonzales took Gerardo's hat off his head.

While reasonable minds could differ as to the reasons Gonzales took Gerardo's cell phone and hat, this Court must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that most supports the verdict. *Jackson*, 443 U.S. at 319; *Jones*, 114 F.3d at 1008. Considering the foregoing, the Court cannot say "no rational trier of fact could have agreed with the" jury's finding that Petitioner had an independent felonious intent to rob Gerardo. *Cavazos*, 565 U.S. at 4.

Further, as the Court of Appeal noted, Petitioner's claim still fails if he and his co-defendants intended to kill Gerardo at the time they robbed him. Indeed, "'[c]oncurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance.'" *People v. Bolden*, 29 Cal. 4th 515, 554 (2002) (quoting *People v. Raley*, 2 Cal. 4th 870, 903 (1992)). Therefore, even if Petitioner and his co-defendants intended to kill Gerardo at the same time as they

22

robbed him, based on the evidence, fair-minded jurists could reasonably find the intent to rob and kill were concurrent.

The Court of Appeal's decision was not an objectively unreasonable application of clearly established federal law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. For these reasons, the Court recommends denying Petitioner's claim that there was insufficient evidence to support the felony-murder special circumstance.

### D. Substantive Gang Findings and Gang Special Enhancements

In Petitioner's third insufficient evidence claim, he contends there was insufficient evidence to support the jury's finding of guilt on the substantive gang crimes and true findings on the gang special circumstance allegations and the gang enhancements. (Doc. 1 at 8.) Petitioner maintains there was insufficient evidence to prove the "primary activities" element of the statutory definition of a criminal street gang, because the gang expert, Hudson, used the phrase "primary criminal activities" rather than "primary activities" in describing the activities of the Loma Bakers gang. *Id.*

Petitioner was alleged to be a member of the Loma Bakers gang and convicted of being an active participant in a criminal street gang (Cal. Penal Code § 186.22(a)). Further, the jury found true the allegation that the murder was committed while Petitioner was an active member of the gang (Cal. Penal Code § 190.2(a)(22)). As to the murder, robbery, and shooting into an occupied vehicle counts, the jury found true the allegations that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang (Cal. Penal Code § 186.22(b)(1)).

Pursuant to California Penal Code § 186.22(f), "'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated . . . ."

As the Court of Appeal stated, to establish that a group is a "criminal street gang," one element the prosecutor must prove is that the group's "primary activities" is the commission of enumerated crimes. *See* Cal. Penal Code § 187.22(e).

### 1. State Court of Appeal Opinion

The Court of Appeal denied Petitioner's claim that there was insufficient evidence to establish the primary activities of the Loma Bakers gang:

> [Petitioner] and Gonzales challenge the sufficiency of the evidence to support the gang-related special allegations and substantive gang offense on the ground the prosecution presented insufficient evidence to prove the "primary activities" (§ 186.22, subd. (f)) element of the statutory definition of a criminal street gang because, throughout his testimony, the prosecution's gang expert, Deputy Hudson, primarily used the phase *primary criminal activities* rather than *primary activities* in describing the activities of the Loma Bakers gang. . . .
>
> To establish that a group is a "criminal street gang" within the meaning of the relevant statute, the prosecution must prove, among other elements, that one of the group's primary activities is the commission of one or more offenses listed in section 186.22. subdivision (e), and that the group's members engage in, or have engaged in, a pattern of criminal gang activity. (§ 186.22, subd. (f); *People v. Duran* (2002) 97 Cal.App.4th 1448, 1457.)
>
> The term "'primary activities' . . . implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [ ] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) Sufficient proof of these "primary activities [may] consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute," or testimony from a police gang expert, who bases his or her opinion on conversations with gang members, personal investigations of crimes committed by gang members, and information from law enforcement colleagues. (*Id*. at p. 324, italics omitted.) We may consider both past and currently charged offenses as part of the gang's "'primary activities.'" (*Id*. at p. 323.)
>
> [Petitioner] and Gonzales do not dispute that the jury instructions given in this case correctly defined a "criminal street gang" pursuant to CALCRIM No. 736, in relevant part, as a group having "as one or more of its primary activities, the commission of Murder, Assault with a Deadly Weapon, Narcotics Trafficking, and Possession of Firearm by a Felon. . . ." Nor do they dispute that there was sufficient evidence to show they were active members of a group known as the Loma Bakers or otherwise challenge any of the other elements of the relevant gang statute.

Instead, as mentioned above, [Petitioner] and Gonzales contend the prosecution presented insufficient evidence the Loma Bakers gang had, as one or more of its primary activities, the commission of the qualifying offenses listed in the jury instruction based on Hudson's use of the phrase *primary criminal activities* in his testimony instead of *primary activities*. [Petitioner] thus asserts "[t]he jury could not infer that the primary criminal activities were also the primary activities without committing the logical fallacy of composition, assuming that what was true for the part (criminal activities) was also true for the whole (all activities)."

This argument fails because the jury was not required to commit any logical fallacies in order to find that the commission of crimes Hudson described (and listed in his accompanying PowerPoint presentation) as constituting the Loma Bakers "primary criminal activities" also constituted the gang's "primary activities" because the prosecutor pointedly elicited testimony from the gang expert confirming this to be the case and adding, "[the Loma Bakers] have been consistent that way since I've been in law enforcement here."

Moreover, we see little support in the record for [Petitioner's] assertion that the "noncriminal activities" of the Loma Bakers might "predominate, so that commission of a particular crime would not be a primary activity even though, when only the organization's criminal activities are taken into account, it is a primary activity within the subset." Hudson's testimony describing how the Loma Bakers benefitted from the commission of crimes he listed as their "primary criminal activities" actually helped to illustrate the fundamentally *criminal* purpose of the group and to show how the crimes it committed were not only primary activities of the group but necessary to its existence. For example, Hudson testified that one of the gang's primary criminal activities was the sale of controlled substances, explaining that, because most gang or relatives, and relied on illegal drug sales to raise money to purchase "whatever they may need to commit their next crime."

[Petitioner's] argument on appeal, ironically, relies heavily on Hudson's testimony that Loma Baker gang members commonly congregated and spent their days hanging out at Jefferson Park as evidence the gang functioned as a social association "quite apart from any criminal purpose." This reliance ignores or overlooks earlier testimony by the gang expert indicating it was largely the gang members' involvement in criminal activity which influenced their selection of Jefferson Park as a meeting place in the first place, specifically because of the opportunities the park provided to evade apprehension by law enforcement officers. Hudson thus explained that "there's large areas that are hilly, so it's very difficult to catch people in that park" and "very easy to get away and evade law enforcement."

[Petitioner] further claims that Hudson's opinion regarding the Loma Bakers' primary activities lacked adequate foundation because the expert's testimony revealed it was based on an incorrect legal conclusion entitled to no weight. Thus, he asserts that "the expert made it clear that in his opinion a crime qualified as a primary criminal activity of the gang even if, to his knowledge, there was only a

single instance of commission of that crime" and "[o]f course this is flatly contrary to the Supreme Court's admonition that a primary activity must be one of the 'chief' or 'principal' activities of the gang, not an 'occasional,' activity, must less a one-time episode."

Assuming [Petitioner] did not forfeit his foundational challenge by failing to raise it below, we reject it on the merits. As a general matter, we note that [Petitioner's] arguments challenging the foundation of Hudson's opinions are based on isolated statements taken out of context from his cross-examination testimony. When read in context with the expert's testimony as a whole, we conclude these statements do not support his arguments.

Contrary to [Petitioner's] assertions, Hudson's cross-examination testimony did not demonstrate Hudson erroneously believed a single commission of murder by a Loma Baker gang member would suffice to establish the commission of murder was a primary activity of the gang. [FN7] In his testimony and PowerPoint "slide" addressing the Loma Bakers primary activities, Hudson referred to the commission of crimes in the *plural*; i.e. "murders, robberies, assault with deadly weapons, sales of controlled substances," and "illegal weapons possessions." The expert's testimony further established that the opinions he rendered in this case were based not only on the "hundreds" of gang-related investigations he had personally been involved in, but also on his extensive training and conversations with other officers and actual gang members. Therefore, a reasonable interpretation of the cross-examination testimony cited by [Petitioner] is not that the expert believed his knowledge of a single murder committed by a Loma Baker gang member would be sufficient by itself to satisfy the primary activities element of the gang statute, but rather that, even if he was personally aware of only one such murder, he would still consist murder to be a primary activity of the gang based, not on his personal knowledge of one murder, but on his training and all the other sources of information he properly reviewed and relied on in rendering his expert opinions in this case.

> FN7 [Petitioner] specifically relies on this exchange during Hudson's cross examination by Garcia-Santos's trial attorney: "Q. Do you use the number of the types of crimes in determining whether or not it's a primary criminal activity? [¶] A. The number – [¶] Q. The number of that certain crime committed. [¶] A. Okay. I don't specifically. I just use crimes that I'm aware of myself. [¶] Q. Okay. So let's say, for example, you're aware of one crime, a certain crime. Let's say, for example, you're aware of one murder committed by the Loma Bakers. [¶] A. Okay. [¶] Q. With one murder committed by the Loma Bakers. [¶] A. consider that to be a primary criminal activity? [¶] A. With one murder? [¶] Q. Yes. [¶] A. I could still consider it being a primary criminal activity. I'm aware of it."

We have likewise reviewed and reject similar arguments [Petitioner] raises challenging the adequacy of the gang expert's opinion based on isolated statements taken out of context from his lengthy testimony. We conclude the evidence in this case was more than sufficient to sustain the primary activities element of the

statutory definition of a criminal street gang and we do not find any of [Petitioner's] or Gonzales's contrary arguments to be persuasive.

(Lodged Doc. 13 at 22-27.)

### 2. Denial of Petitioner's Insufficient Evidence of Gang Activity Claim Was Not Objectively Unreasonable

Petitioner argues the prosecutor did not present sufficient evidence to prove the "primary activities" element for the definition of a criminal street gang. Pursuant to California Penal Code § 186.22(f), a requirement for a criminal street gang is that the group has, as one of its primary activities, one or more of the crimes specified in subdivision (e). "Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony." *People v. Sengpadychith*, 26 Cal.4th 316, 324 (2001).

The California Supreme Court has found that an expert witness's opinion, based on conversations with gang members, personal investigation of crimes committed by gang members, and information from colleagues, is sufficient evidence of the "primary activity" element to proving an association was a "criminal street gang." *People v. Gardeley*, 14 Cal. 4th 605, 620 (1996).

Here, Hudson, the gang expert, testified that the primary activities of the Loma Bakers gang members included "murders, robberies, assault with deadly weapons, sales of controlled substances, methamphetamine, heroin, cocaine, marijuana. They're also going to include weapons and other violations." (Reporter's Transcript 24 at 4377.) The prosecutor asked, "the primary criminal activities that you listed, murder, robbery, narcotic sales, those crimes, were those the primary activities of the Loma Bakers gang members in 2011?" *Id.* at 4380. Hudson responded, "Yes, ma'am, they have been consistent that way since I've been in law enforcement here." *Id.* After the prosecutor asked, "From August 1st of 2010 through May 15th of 2011, in your opinion, . . . was the gang involved in primary criminal activities that you mentioned?"; Hudson again

27

confirmed that they were involved in those primary activities.  *Id*. at 4489.

In addition to Hudson's testimony about the primary activities of the Loma Bakers gang, co-defendant Gonzales' gang expert, Hunter, testified about the gang.  Hunter testified that he had known the Loma Bakers gang since the 1980's, and had interviewed members, listened to testimony, and reviewed police reports, probation reports, court transcripts, and other documents about them.  (Reporter's Transcript 26 at 4864.)  Hunter testified that "[a]t the present time it is my opinion that [the Loma Bakers gang is] a criminal street gang."  *Id*. at 4866.  Based on Hunter's testimony that the Loma Bakers gang is a "criminal street gang," the "primary activities" of the gang are the ones enumerated in § 186.22(e).

Petitioner contends Hudson's use of the phrase "primary criminal activities" rather than the phrase "primary activities" established, for the jury, that the gang only engaged in criminal activities, whereas Petitioner states there "was evidence that the gang . . . devoted much of it's time to social activities, not crimes."  *Id*.

Petitioner's argument is unavailing.  Based on the transcript, it appears Hudson used the phrases "primary criminal activities" and "primary activities," interchangeably.  To clear up any confusion, the prosecutor asked, "the primary criminal activities that you listed, murder, robbery, narcotic sales, those crimes, were those the primary activities of the Loma Baker gang members in 2011?"  (Reporter's Transcript 24 at 4380.)  Hudson answered, "Yes ma'am, they have been consistent that way since I've been in law enforcement here."  *Id*.

Further, the prosecutor only had to show that *one* of the primary activities of the Loma Bakers gang was the commission of crimes.  *Sengpadychith*, 26 Cal. 4th at 324-25 (citing *People v. Gamez*, 235 Cal. App. 3d 957, 970-71 (1991)).  Therefore, evidence that the gang devoted time to "social activities" does not diminish the evidence that one of the gang's primary activities was the commission of crimes.

28

Finally, Petitioner claims Hudson's opinion was erroneous as a matter of law because he "made it clear that in his opinion a crime qualified as a primary criminal activity of the gang even if, to his knowledge, there was only a single instance of [the] commission of that crime." (Doc. 1 at 8.) Petitioner bases this claim on an exchange during cross-examination between co-defendant Garcia-Santos's attorney and Hudson:

Q. When you mention primary activities, you said that the Loma Bakers have primary activities, and I think you listed . . .

You had listed murders, robberies, assaults with deadly weapons with force likely to cause great bodily injuries, sales of controlled substance, and weapons possession, and, paren, firearms with that. Is that right?

A. Those are some of the charges I listed, yes.

. . .

Q. [I]t's primary criminal activities for the Loma Bakers, right?

A. Those are some of the primary criminal activities, yes, sir.

Q. So that list that you've included there is not exclusive?

A. No, sir, there are other crimes committed by those gang members. I just chose a few to put in there.

Q. Okay. And how do you determine whether or not a particular kind of crime is a primary criminal activity?

A. Based on my knowledge, reports reviewed, different things that have come across my desk, information, intelligence, contacts, what crimes are committed by gang members.

Q. Well, primary criminal activities for the Loma Bakers, what criteria do you use to establish a certain crime as being a primary criminal activity?

A. Predicate cases that I have access to. Again, contacts, reports. I don't have – if you're asking like a checklist for criteria, I don't have that.

Q. Are there crimes committed by the Loma Bakers that are not – that you would not consider to be primary criminal activity?

A. There could be, yes.

Q. What are some of those?

A.    I'm not particularly aware of like identity thefts, certain things like that. I have not heard of them. So that would be one, I guess, that I could provide.

Other than that, I could – I don't know. I don't know if I could list any others right off the top of my head, sir. I'd have to –

. . .

Q.    Do you use the number of types of crimes in determining whether or not it's a primary criminal activity?

A.    The number –

Q.    The number of that certain crime committed.

A.    Okay. I don't specifically. I just use crimes that I'm aware of myself.

Q.    Okay. So let's say, for example, you're aware of one crime, a certain crime. Let's say, for example, you're aware of one murder committed by the Loma Bakers.

A.    Okay.

Q.    With one murder committed by the Loma Bakers, would that be – would you consider that to be a primary criminal activity?

A.    With one murder?

Q.    Yes.

A.    I could still consider it being a primary criminal activity. I'm aware of it.

Q.    Okay, so your definition of primary criminal activities, then, is if you are aware of a crime committed by a Loma Baker, then it's going to be a primary criminal activity.

A.    Many crimes committed by them I would list as primary. There are more than what I put on that slide. I just chose a few that would fit on the slide, sir.

(Reporter's Transcript 26 at 4764-67.)

Petitioner contends this one exchange during cross-examination supports his argument that Hudson improperly based his definition of "primary activities" on one single incident. However, Hudson testified extensively that he knows of the activities of the Loma Bakers gang based on

30

"[n]umerous investigations. I've testified against them. I've had numerous contacts with them. I've been at the scene of crimes involving them. I've made numerous arrests of Loma Baker gang members." (Reporter's Transcript 24 at 4367.) Therefore, the evidence does not suggest that Hudson based his opinion about the Loma Bakers' primary activities on one member of the Loma Bakers gang committing one crime.

Considering the foregoing, there was sufficient evidence of the Loma Bakers' "primary activities" to sustain the substantive gang crimes and true findings on the gang special circumstance allegations and the gang enhancements. The Court of Appeal's decision was not an objectively unreasonable application of clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. For these reasons, the Court recommends denying Petitioner's claim that there was insufficient evidence to support the gang convictions.

### E. First Degree Murder

In Petitioner's fourth insufficient evidence claim, he alleges there was insufficient evidence to prove he personally intended to kill Gerardo. (Doc. 1 at 6.) Petitioner maintains the evidence of a conspiracy to commit murder relied on text messages, which he did not participate in. *Id.*

#### 1. State Court of Appeal Opinion

The Court of Appeal found Petitioner's claim that there was insufficient evidence to support the first degree murder charge was unavailing:

> [Petitioner] and Gonzales both contend there was insufficient evidence to support their convictions of premeditated first degree murder. . . . Although [Petitioner] and Gonzales challenge the sufficiency of the evidence to support their murder convictions on the various theories presented to the jury, we need only address the sufficiently of the evidence to support their convictions under one of those theories. . . . [T]he jury's findings on the gang special circumstance (§ 190.22, subd. (a)(2)) make clear the jury found [Petitioner], Garcia-Santos, and Gonzales guilty of first degree premeditated murder under a theory of direct aiding and abetting. Substantial evidence supports appellants' convictions under this theory.

"Aiders and abettors may . . . be convicted of first degree premeditated murder based on direct aiding and abetting principles. [ ] Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu*, *supra*, 59 Cal.4th at pp. 166-167.) "An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Id.* at p. 167.)

Notwithstanding [Petitioner's] and Gonzales's contrary arguments, which are based on selective readings of the record, we conclude the evidence was more than sufficient to show that they and Garcia-Santos knowingly and intentionally assisted Toscano's commission of premeditated murder. The circumstances surrounding the shooting, combined with the gang expert's testimony, gave rise to a reasonable inference that appellants, acting as a group, purposefully set out together to the location of the quinceañera, and pretended to be members of the rival Westside Bakers gang, with the intent of finding and killing a member of the rival gang in retaliation for the shooting of Toscano's brother just six days earlier. As reflected by the gang expert's testimony regarding the hypothetical based on the underlying incident, there was evidence showing appellants acted as a group throughout the incident, including by coming back to surround or at least remaining in close proximity to the car when Toscano went back to shoot [Gerardo]. The gang expert's testimony and [other] testimony also supported a reasonable inference that the other appellants knew Toscano was armed, and knew what he was deliberating and intending to do when he returned to the car, opened the door, and shot Gerardo, and that they intended to back him up in his commission of the murder.

(Lodged Doc. 13 at 21-22.)

### 2. Denial of Petitioner's Insufficient Evidence of First Degree Murder Claim Was Not Objectively Unreasonable

The Court of Appeal found there was sufficient evidence to convict Petitioner of first degree murder under an aiding and abetting theory. An individual is guilty of first degree murder under an aiding and abetting theory,

if the person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating, or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.

*People v. Cooper*, 53 Cal. 3d 1158, 1164 (1991) (citing *People v. Beeman*, 35 Cal. 3d 547, 561(1984)). "Among the factors which may be considered in making the determination of aiding

32

and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense." *In re Lynette G.*, 54 Cal. App. 3d 1087, 1094 (1976).

Petitioner contends the "sole arguable basis for finding that [he] was part of a conspiracy and premeditated to commit murder relied on a series of text messages" of which he was not a part. (Doc. 1 at 6.) Although Petitioner was not part of the text message exchange, the messages between members of the gang showed the gang's intent to retaliate for the shooting of Jacob, co-defendant Toscano's brother, which occurred six days before Gerardo was killed. Albarran[8] and a Loma Bakers gang member, Sicko, texted:

| | |
|---|---|
| Albarran: | "You heard what happened to Lil J?"[9] |
| Sicko: | "Yea I did.  I wanna get them fools who did it, dog.  You down or what?" |
| Albarran: | Hell, yeah, I'm down.  I don't know who.  Lil E[10] told me they were Weaksiders." |

(Reporter's Transcript 23 at 4256-57.)

In a later conversation between the two,

| | |
|---|---|
| Sicko: | "What did Lil E say?  Are we gonna get them foos or what?" |
| Albarran: | "Kosher said yea."[11] |
| Sicko: | "Cool.  I'm ready whenever" |
| Albarran: | "That's right, G." |

*Id.* at 4258

In a text message exchange between co-defendant Garcia-Santos and his girlfriend on the day of the murder, Garcia-Santos told his girlfriend he could not attend an event with her because,

---

[8] Albarran was originally named as a defendant, but entered a plea of no contest prior to Petitioner's trial.  (Lodged Doc. 13 at 2.)
[9] "Lil J" refers to Jacob Toscano, brother of Petitioner's co-defendant Toscano.  As described fully in section I, *supra*, Jacob was shot on April 24, 2011.
[10] "Lil E" refers to co-defendant Toscano.
[11] "Kosher" is an older Loma Bakers gang member.  (Reporter's Transcript 24 at 4486.)

"I got things to handle to by tonight." *Id*. at 4239. Later, when his girlfriend asked if he was ok, Garcia-Santos replied, "Yeah, but we're going to the west side in a bit." *Id*. at 4239-40. At 6:00 p.m., Garcia-Santos texted Jacob that he was with Joseph Gonzales, a Loma Bakers gang member, Albarran, and Petitioner. *Id*. at 4242. At 8:16 p.m., when he was at the restaurant where the quinceañera was being held, Garcia-Santos texted his girlfriend that he did not know what time he would be home and "We're waiting." *Id*. at 4243. Gerardo was killed at 9:03 p.m. *Id*.

Based on these text messages, it would be reasonable to conclude that Petitioner and his co-defendants went to the quinceañera to retaliate for the shooting of Jacob. The evidence at trial revealed that when they arrived at the quinceañera, Petitioner's group tried to identify members of their rival gang, the Westside gang, by pretending to be Westside gang members. One of the co-defendants, believed to be Toscano, asked a quinceañera attendee where the "Westies" were. The attendee pointed to the table where Gerardo and his friends were sitting, even though he was not sure that they were Westside gang members. Petitioner's group acted together to find potential victims.

Before the shooting and while the co-defendants were standing in a circle near each other, Toscano lifted his shirt to show Melina, the woman who had invited him to the quinceañera, a gun tucked into the waist band of his shorts. Therefore, it was reasonable to infer that all the co-defendants knew that Toscano was carrying a gun.

Once Gerardo and his friends walked to their car, Petitioner's group followed them. Toscano's hand was underneath his sweatshirt as he followed Gerardo. When Petitioner's group surrounded Gerardo's car, as a group, they continued to pretend they were part of the Westside gang. When Gerardo told Petitioner's group, "I'm from the West Side, too," co-defendant Gonzales responded, "You not from my hood." At that point, Petitioner's group began to harass and intimidate Gerardo and, as a group, blocked the car so that Gerardo could not get away from them.

34

Gonzales stole Gerardo's phone and hat and the co-defendants taunted Gerardo and his friends, calling them "little bitches."

Further, Hudson testified that a gang would retaliate if one of their gang members was shot, with an equal or greater use of violence. (Reporter's Transcript 24 at 4430-32.) He also testified that the retaliation would be led by a family member who was also in the gang, which is how the shooting unfolded in this case. *Id*. at 4432-33. After Jacob was shot, his brother, co-defendant Toscano, brought his gun to the quinceañera and killed Gerardo.

Based on this evidence, the co-defendants appear to have acted together to find a victim, knowing that they wanted to seek revenge for Jacob's death and knowing that Toscano was carrying a gun, and while harassing and taunting Gerardo, encouraged the crimes of robbery and then shot Gerardo. In view of these facts, it was reasonable for the Court of Appeal to find that Petitioner knew of Toscano's unlawful purpose, and intended to commit, facilitate, or encourage the commission of the crime by acting, aiding, promoting, encouraging, or instigating the commission of the crime.

Therefore, the Court of Appeal's decision was not an objectively unreasonable application of clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. For these reasons, the Court recommends denying Petitioner's claim that there was insufficient evidence to support the first degree murder conviction.

## V.     A Jury Instruction Error Does Not Present A Cognizable Federal Claim

In his third ground for habeas relief, Petitioner alleges that CALCRIM No. 400,[12] the jury

---

[12] As read to the jury, CALCRIM No. 400 provides:

> A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.

instruction on aiding and abetting, incorrectly instructed the jury on aiding and abetting. (Doc. 1 at 8.) Petitioner contends the instruction improperly instructed the jury that an aider and abettor is equally guilty with the principal. *Id*. Respondent counters that this claim is procedurally defaulted, because the Court of Appeal found the claim was forfeited due to Petitioner's failure to object to the instruction during the trial. (Doc. 23 at 36-37.) Respondent also argues that the Court of Appeal's decision was not an unreasonable factual determination and did not contravene clearly established federal precedent. *Id*. at 37.

### A. <u>Standard of Review for Alleged Errors in Jury Instructions</u>

Generally, claims of instructional error are questions of state law and are not cognizable on federal habeas review. "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438, n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules")). A petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process." *Langford*, 110 F.3d at 1389 (citing *Melugin v. Hames*, 38 F.3d 1478, 1482 (9th Cir. 1994)).

To prevail on a collateral attack of state court jury instructions, a petitioner must do more that prove that the instruction was erroneous. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). Instead, the petitioner must prove that the improper instruction "by itself so infected the entire trial that the resulting conviction violated due process." *Estelle*, 502 U.S. at 72 (internal citations omitted). Even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict. *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776).

A federal court's review of a claim of instructional error is highly deferential. *Masoner*

*v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993). A reviewing court may not judge the instruction in isolation but must consider the context of the entire record and of the instructions as a whole. *Id.* The mere possibility of a different verdict is too speculative to justify a finding of constitutional error. *Henderson*, 431 U.S. at 157. "Where the jury verdict is complete, but based upon ambiguous instructions, the federal court, in a habeas petition, will not disturb the verdict unless there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir. 2000) (quoting *Estelle*, 502 U.S. at 72) (internal quotation marks omitted).

If a trial court has made an error in an instruction, a habeas petitioner is only entitled to relief if the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776) (internal quotation marks omitted). A state prisoner is not entitled to federal habeas relief unless the instructional error resulted in "actual prejudice." *Id.* A violation of due process occurs only when the instructional error results in the trial being fundamentally unfair. *Estelle*, 502 U.S. at 72-73; *Duckett v. Godinez*, 67 F.3d 734, 746 (9th Cir. 1995). If the court is convinced that the error did not influence the jury, or had little effect, the judgment should stand. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).

### B. State Court of Appeal Opinion

The Court of Appeal denied Petitioner's claim, holding that he forfeited the claim because he failed to object to the instruction at trial. In the alternative, the Court of Appeal found any mistake in the instruction harmless.

> Prior to 2010, CALCRIM No. 400, defining the general principles of aiding and abetting, advised that a person is "equally guilty" of a crime whether he or she committed the crime personally or aided and abetted the perpetrator. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165 (*Samaniego*), citing former CALCRIM No. 400 (2009 rev.).) The "equally guilty" language has since been removed from the instruction. (See CALCRIM No. 400 ["A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator"].) Although the proceedings below were conducted in 2012, the jury

37

was instructed pursuant to an outdated version of CALCRIM No. 400. [Petitioner], Garcia-Santos, and Gonzales allege instructional error based on the "equally guilty" language that was used in the trial court's explanation of the law concerning accomplice liability. FN10

> FN10 "The relevant text of the instruction read: 'A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator.'"

None of the appellants objected to, nor requested modification or clarification of, the challenged instruction. This failure to act should be fatal to their claim since there are several published opinions which hold that a challenge to the "equally guilty" language in former versions of CALCRIM No. 400 is forfeited by a failure to object and/or request clarifying language at the time of trial. (*E.g., People v. Mejia* (2012) 211 Cal.App.4th 586, 624 [addressing challenge to the "equally guilty" language in CALJIC No. 3.00]; *People v. Lopez* (2011) 198 Cal.App.4th 788, 809]; *Samaniego, supra*, 172 Cal.App.4th at p. 1163.). Forfeiture aside, we find the alleged error to be harmless under any standard of prejudice.

The challenged version of CALCRIM No. 400 did not contain an incorrect statement of law. "All principals, including aiders and abettors, are 'equally guilty' in the sense that they are criminally liable." (*People v. Bryant, Smith* and *Wheeler* (2014) 60 Cal.4th 335, 433; accord, § 31 ["All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed"].) Nevertheless, a number of appellate decisions hold that under extraordinary circumstances, the aider and abettor may have a mental state which reflects a lesser level of culpability than that of the direct perpetrator. (See, e.g., *Samaniego, supra*, 172 Cal.App.4th at pp. 1164-1165 ["while generally correct in all but the most exceptional circumstances, [CALCRIM No. 400] is misleading here and should have been modified"].)

According to the California Supreme Court, it is possible for an aider and abettor to be convicted of a crime greater than the offense for which the actual perpetrator is liable. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118-1119, 1122.) In light of this holding, appellate courts have reasoned that the opposite must be true, i.e., an aider and abettor can theoretically be convicted of a lesser crime than the offense for which the actual perpetrator is liable. (*Lopez, supra*, at p. 1118; *Nero, supra*, 181 Cal.App.4th at pp. 513-518; *Samaniego, supra*, 172 Cal.App.4th at pp. 1163-1164.) Given these possible outcomes, the "equally guilty" language is potentially misleading insofar as it suggests that the direct perpetrator and the aider and abettor must be found guilty, if at all, of the same crime(s) and degree(s) thereof. However, reversible error stemming from the use of this language has only been found in cases where jurors informed the trial court that they were confused by the instruction, and the court failed to provide adequate clarification in response to their inquiries on the subject. (*People v. Loza* (2012) 207 Cal.App.4th 332, 352-355 (*Loza*); Nero, *supra*, 181 Cal.App.4th at pp. 517-520.)

We do not presume a jury has been misled by an erroneous instruction. To the contrary, "[a] defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.) Otherwise, we adhere to the presumption that jurors are "able to understand and correlate instructions," and follow the instructions that they are given. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) This presumption was rebutted in *Loza* and *Nero*, *supra*, through evidence which clearly showed that the jurors were confused as to what mental state was required to establish aider and abettor liability. (*Loza*, *supra*, 207 Cal.App.4th at p. 355 ["the questions this jury asked indicated that despite having been provided instructions from which they should have understood that they were required to consider the intent of the person accused of aiding and abetting the perpetrator the jury remained confused as to this issue"]; *Nero*, *supra*, 181 Cal.App.4th at p. 518 ["where, as here, the jury asks the specific question whether an aider and abettor may be guilty of a lesser offense, the proper answer is 'yes,' she can be. The trial court, however, by twice rereading CALJIC No. 3.00 [containing the 'equally guilty' language] in response to the jury's questions, misinstructed the jury"].) Here, in contrast, the record is devoid of any indication that the jury was confused by the aiding and abetting instructions.

"In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.) A jury instruction is not judged in artificial isolation, but rather from the entire charge of the court and the overall trial record. (*People v. Solomon* (2010) 49 Cal.4th 792, 822; *People v. Moore* (1996) 44 Cal.App.4th 1323, 1330-1331.) In this case, the instruction given under CALCRIM No. 400 was immediately followed by a more detailed explanation of the required mens rea for aiding and abetting liability as set forth in CALCRIM No. 401. FN11

> FN11 CALCRIM No. 401 instructed the jury: "To prove that defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to have actually been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her

an aider and abettor. [¶] A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed. . . ."

Considering that the jury was properly instructed under CALCRIM No. 401 and expressed no confusion regarding the "equally guilty" language in CALCRIM No. 400, we are not persuaded that a miscarriage of justice occurred through the use of the latter instruction. (See *Lopez*, *supra*, 198 Cal.App.4th at pp. 1119-1120 [any error in CALCRIM No. 400's "equally guilty" language was harmless where jury was also instructed with CALCRIM No. 401].) The entirety of the instructions properly informed the jury as to the intent required for aider and abettor culpability. We thus conclude that the conclusion of the phase, "equally guilty" in CALCRIM No. 400 did not constitute reversible error.

(Lodged Doc. 13 at 35-39.)

## C. The Court Did Not Err in Instructing the Jury on Aiding and Abetting

Petitioner's claim is procedurally defaulted. A federal court cannot review claims in a petition for writ of habeas corpus if a state court denied relief on the claims based on state law procedural grounds that are independent of federal law and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements." *Park v. California*, 202 F.3d 1146, 1150 (2000).

A petitioner procedurally defaults his claim if he fails to comply with a state procedural rule or fails to raise his claim at the state level. *Peterson v. Lampert*, 319 F.3d 1153, 1156 (9th Cir. 2003) (citing *O'Sullivan v. Boerckel*, 562 U.S. 838, 844-45 (1999)). The procedural default doctrine applies when a state court determination of default is based in state law that is both adequate to support he judgment and independent of federal law. *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). An adequate rule is one that is "firmly established and regularly followed." *Id.* (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)); *Bennett v. Mueller*, 322 F.3d 573, 583 (9th Cir. 2003). An independent rule is one that is not "interwoven with federal law." *Park*, 202 F.3d 1146 at 1152 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).

When a state prisoner has defaulted on his federal claim in state court pursuant to an

independent and adequate state procedural rule, federal habeas review of the claim is barred, unless the prisoner can demonstrate cause for the default and actual prejudice as a result of an alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.[13]

In California, "an appellate court will not consider a claim of error if an objection could have been, but was not, made in the lower court." *People v. French*, 43 Cal. 4th 36, 46 (2008) (citing *People v. Saunders*, 5 Cal. 4th 580, 589-90 (1993)). The rule is in place because "[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided." *Id.* (quoting *People v. Vera*, 15 Cal. 4th 269, 276 (1997) (internal quotation marks omitted)). This forfeiture rule applies to a petitioner who fails to object to a jury instruction. *People v. Virgil*, 51 Cal. 4th 1210, 1260 (2011) "Defendant's failure to object to the instruction below . . . forfeits the claim on appeal."). Indeed, in this case, the Court of Appeal noted published opinions that held "a challenge to the 'equally guilty' language in former versions of CALCRIM No. 400 is forfeited by a failure to object and/or request clarifying language at the time of trial." (Lodged Doc. 13 at 36) (internal citations omitted).

The Ninth Circuit has held that California's contemporaneous objections doctrine is clear-well-established, and has been consistently applied. *Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002.) This bar is independent and adequate, and applied consistently by California courts; therefore, Petitioner's claim is procedurally barred. *Vansickel v. White*, 166 F.3d 953 (9th Cir. 1999).

The Court of Appeal found an independent and adequate state procedural ground.

---

[13] In this case, the state court found the jury instruction claim was procedurally barred, but also, in the alternative, adjudicated the claim on the merits. The procedural bar stands regardless of the Court's decision to also adjudicate the claim on the merits. *See Harris*, 489 U.S. 255, 264 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").

41

Therefore, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Petitioner does not argue "cause for the procedural default," but instead argues that he was prejudiced by the instruction. (Doc. 1 at 8.) To show prejudice, a petitioner "must show 'not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)) (emphasis in original).

Here, the Court of Appeal determined that Petitioner was not prejudiced by the "equally guilty" language in CALCRIM No. 400, because "[t]he challenged version of CALCRIM No. 400 did not contain an incorrect statement of law." (Lodged Doc. 13 at 36.) The California Supreme Court has found the "equally guilty" phrase to be accurate "in all but the most exceptional circumstances." *See, e.g., People v. Samaniego*, 172 Cal. App. 4th 1148, 1164-65 (2009) ("[A]n aider and abettor could be guilty of a greater offense than the direct perpetrator, . . . [thus] an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state. Consequently CALCRIM No. 400's direction that 'a person is *equally guilty* of the crime . . .,'" while generally correct in all but the most exceptional circumstances, [can be] misleading.") (internal citations and quotation marks omitted) (emphasis in original); *People v. Nero*, 181 Cal. App. 4th 504, 517-18 (2010).

The Court of Appeal noted that "reversible error stemming from" this language has only been found where "jurors informed the trial court that they were confused by the instruction, and the court failed to provide adequate clarification in response to their inquiries on the subject." (Lodged Doc. 13 at 37) (internal citations omitted). That is not the case here, as the jury did not

have questions about the instruction, and the jury is presumed to follow the instructions they are given. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

For the Court to grant habeas relief based upon an error in a jury instruction, there must be a "reasonable likelihood" the jury applied the instruction in a way that violated the Constitution. *Solis*, 219 F.3d at 927 (quoting *Estelle*, 502 U.S. at 72). The instruction may not be construed in isolation, but rather, in the context of all the other jury instructions and the trial record as a whole. *Estelle*, 502 U.S. at 72. The Court of Appeal found that considering all of the instructions given to the jury, including CALCRIM No. 401, the jury was "properly informed . . . as to the intent required for aider and abettor culpability." (Lodged Doc. 13 at 39.) Based on the foregoing, Petitioner is unable to show there was a "reasonably likelihood" the jury misapplied the instruction. Therefore, the Court recommends denying the claim.

## VI. The Ineffective Assistance of Counsel Claim is Unexhausted

In his fourth claim for relief, Petitioner contends trial counsel was ineffective for failing to object to the wording of CALCRIM No. 400. (Doc. 1 at 8.)

A petitioner who is in state custody and wishes to collaterally challenge his conviction by a petition for writ of habeas corpus must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509, 518 (1982); *Buffalo v. Sunn*, 854 F.2d 1158, 1163 (9th Cir. 1988).

A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Picard v. Connor*, 404 U.S. 270, 276 (1971); *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996). A federal court will find that the highest

43

state court was given a full and fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's factual and legal basis. *Duncan*, 513 U.S. at 365; *Kenney v. Tamayo-Reyes*, 504 U.S. 1, 8 (1992).

The petitioner must also have specifically informed the state court that he was raising a federal constitutional claim. *Duncan*, 513 U.S. at 365-66; *Lyons v. Crawford*, 232 F.3d 666, 669 (9th Cir. 2000), *amended*, 247 F.3d 904 (2001); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999); *Keating v. Hood*, 133 F.3d 1240, 1241 (9th Cir. 1998). If any of grounds for collateral relief set forth in a petition for habeas corpus are unexhausted, the Court must dismiss the petition. 28 U.S.C. § 2254(b)(1); *Rose*, 455 U.S. at 521-22.

Here, Petitioner does not contend that he presented his ineffective assistance of counsel claim in state court. Further, based on the Court's review of his filings in state court, it appears that Petitioner did not present *any* ineffective assistance of counsel claims before the state court. (Lodged Docs. 1, 15.)

Although non-exhaustion of state court remedies has been viewed as an affirmative defense, it is well established that it is the petitioner's burden to prove that state judicial remedies were properly exhausted. 28 U.S.C. § 2254(b)(1)(A); *Darr v. Burford*, 339 U.S. 200, 218-19 (1950), *overruled in part on other grounds in Fay v. Noia*, 372 U.S. 391 (1963); *Cartwright v. Cupp*, 650 F.2d 1103, 1104 (9th Cir. 1981). If available state court remedies have not been exhausted as to all claims, a district court must dismiss a petition. *Rose v. Lundy*, 455 U.S. 509, 515-16 (1982). *See also Raspberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006); *Jiminez v. Rice* 276 F.3d 478, 481 (9th Cir. 2001) (both holding that when none of a petitioner's claims has been presented to the highest state court as required by the exhaustion doctrine, the Court must dismiss the petition).

Because Petitioner did not exhaust his claim for ineffective assistance of counsel before

the state court, the Court recommends denying the petition for failure to exhaust state court remedies.

## VII.    <u>Certificate of Appealability</u>

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

> (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

>> (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

>> (B)  the final order in a proceeding under section 2255.

> (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

> (3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S.

at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief to be debatable or wrong, or conclude that the issues presented required further adjudication. Accordingly, the Court recommends declining to issue a certificate of appealability.

**VIII. <u>Conclusion and Recommendation</u>**

Based on the foregoing, the undersigned recommends that the Court deny the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **July 27, 2018**             /s/ *Sheila K. Oberto*
                                        UNITED STATES MAGISTRATE JUDGE

46